**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SHAUN WRIGHT,                :        **Civil No. 4:07-CV-918**
                            :
    **Plaintiff,**               :
                            :
    **v.**                       :        **(Magistrate Judge Carlson)**
                            :
SCOTT ALTLAND, et al.,       :
                            :
    **Defendant.**               :

## OPINION

### I.    Statement of Facts and of the Case

#### A.    Procedural History

This case comes before the Court for resolution of the final disputed factual issues and contested legal claims advanced by the parties.  This litigation, which draws to a close with this opinion, began on May 15, 2007, when the Plaintiff, Shaun Wright, a state prisoner, filed a *pro se* complaint against Detective Scott Altland, Springettsbury Township and York County.  (Doc. 1)

Mr. Wright's complaint alleged that Detective Altland violated his civil rights in a number of respects during the course of a state criminal investigation and prosecution of the Plaintiff for his role in a September 20, 2005, robbery of a Fulton Bank branch office in Hellam Township, York County, Pennsylvania.  Over the ensuing years the parties have extensively litigated these claims, and have twice

appealed this matter to the United States Court of Appeals for the Third Circuit. See Wright v. Altland, 442 F. App'x 699 (3d Cir. 2011); Wright v. Altland, 360 F. App'x 373 (3d Cir. 2010). As a result of this process, the remaining issues in this litigation have been narrowed and focused substantially. Presently, as described by the appellate court this case entails a single, specific claim:

> Wright's claim that Scott Altland, a detective with the Springettsbury Township Police Department, illegally seized money orders from his girlfriend in connection with a robbery investigation. Altland was responsible for investigating a September 15, 2005, robbery of a Hardee's Restaurant. On September 20, 2005, a bank in a neighboring township was robbed. Altland had reason to believe that the same individual perpetrated both offenses. Accordingly, when he learned that the getaway car used by the bank robber was registered to Wright's girlfriend, Jora Rial, he went to the Yorkshire Apartments in Springettsbury, where Rial lived with Wright, to interview her. At some point during Altland's visit with Rial, he obtained three money orders from her in the amounts of $1,000, $500, and $15, in the rental office of the Yorkshire Apartments. Wright had apparently purchased those money orders with proceeds from the bank robbery, and gave them to Rial for the purpose of paying their rent. Wright was subsequently charged with both the Hardee's robbery and the bank robbery. The money orders were admitted into evidence at Wright's bank robbery trial, and he was ultimately convicted

Wright v. Altland, 442 F.App'x 699, 700 (3d Cir. Aug. 16, 2011).

As to this sole remaining claim, the appellate court has also aptly defined the task before this Court when it reversed the District Court's summary judgment on this

claim, and remanded this case for trial of this seizure claim relating to the seizure of these money orders from Ms. Rial, stating that:

> [T]he record provides little information about the context in which the seizure occurred. Furthermore, Rial's testimony that Altland "took" the money orders out of her hand supports an inference that Altland seized them without first obtaining consent, which must be viewed in Wright's favor under the applicable summary judgment standard. . . . . We will therefore vacate the District Court's grant of summary judgment to Altland on the illegal seizure claim and remand for further proceedings consistent with this opinion.

Id. at 703-04.

Yet, while the court of appeals remanded this case for a trial of this particular claim, it did so noting both that "we agree with the District Court that Rial's possessory interest in the money orders gave her the authority to consent to their seizure", id., n 8 (citing United States v. Stabile, 633 F.3d 219, 230-231 (3d Cir. 2001) and United States v. Morales, 861 F.2d 396, 399-400 (3d Cir. 1988)), and that, "[o]ur conclusion does not prohibit Altland from later establishing that the seizure was justified by consent or by another exception to the warrant requirement," id., n. 9.

The court of appeals remanded this case for further proceedings on September 14, 2011. (Doc. 112.) Following remand, on December 14, 2011, the parties consented to proceed to a non-jury trial before the undersigned.(Docs. 125 and 126)

3

We then scheduled a pretrial conference for February 17, 2012, and a non-jury trial of this remaining claim for February 21, 2012. (Docs. 130, 138, 139)

Mr. Wright's trial, which was focused exclusively on Wright's claim that Detective Altland violated the Plaintiff's rights by seizing money orders in the possession of his former girlfriend, Ms. Rial, was noteworthy in what it did not present to the Court. Despite the fact that Mr. Wright's remaining constitutional claims were entirely premised upon his assertion that Ms. Rial did not consent to the seizure of these money orders, Mr. Wright did not present Ms. Rial as a witness at this trial. Instead, Mr. Wright's case was limited to the testimony of Detective Altland, and brief summary testimony from the Plaintiff himself. Following this evidentiary presentation, and argument by the parties, this matter is now ripe for resolution.

### B.    **Factual Findings**

With respect to the remaining issue in this litigation regarding the seizure of money orders from Ms. Rial, we make the following findings of fact:

On the morning of September 20, 2005, the Fulton Bank branch office in Hellam Township, York County, was robbed of more than $5,000 in cash. A description of the robber matched the description of the perpetrator of an earlier

September 15, 2005, robbery of a Hardee's Restaurant in nearby, Springettsbury Township, and was consistent with the appearance of the Plaintiff, Shaun Wright.

At the time of the robbery, witnesses described a green or teal Ford Escort, bearing a Pennsylvania license tag, which had been identified as the getaway car in the Fulton Bank robbery. When police ran the registration for this getaway car they determined that the car was registered to Mr. Wright's girlfriend, Jora Rial, who resided at the Yorkshire Apartments. Notified of this information, Detective Altland then traveled to this apartment complex where he met with the manager of the apartment building. The manager informed Detective Altland that Ms. Rial resided in the apartment complex with her boyfriend, the Plaintiff, Shaun Wright. The manager also informed police that Wright and Rial were behind on their rent, but that Rial had called the apartment manager's office shortly after the bank robbery, reported that they had come into substantial money, and made arrangements to pay the back rent that she and Wright owed.

Thus, by the morning of September 20, 2005, police had confirmed that a person who generally matched the description of Mr. Wright had robbed a local bank, and escaped in a green compact car. The license plate on that car came back as registered to Mr. Wright's girlfriend, Jora Rial, who resided at the Yorkshire Apartments with Wright. When police traveled to the apartment rental office they

learned that Wright and Rial rented an apartment at the complex, but were behind on their rent payments. While police were gathering this information, which linked Wright to the getaway car used in the robbery and provided a financial motive for the crime, they also learned from the apartment manager that Jora Rial had reported that she had come into a large sum of money shortly after the robbery, and was stopping by to drop off payments for the back rent that was due and owing on the apartment she shared with Wright.

Informed of these facts, which now also linked Wright and Rial to the sudden accumulation of wealth on the morning of the bank robbery committed by a man who used Rial's car to make his escape, police waited for Ms. Rial to arrive at the rental office. When Ms. Rial approached the rental office, Detective Altland and another police officer met her outside the office. According to Detective Altland, when Rial approached the office he introduced himself to her and asked if she had come to the office to pay back rent. When Ms. Rial stated that she had arrived at the apartment manager's office for this purpose, Detective Altland recounted that he then explained to Rial why he was at the apartment complex and asked if he could see the money orders she had in her possession. In this regard, Detective Altland candidly acknowledged that he did not expressly ask for Ms. Rial's consent to view the money orders. Instead, he only asked her if he could see the money orders. In response to

this question, Ms. Rial handed the money orders over to him without objection providing three money orders, in the amount of $1,000, $500 and $15, to the detective.

After turning the money orders over to Detective Altland, Ms. Rial initially told the detective that Wright had called her at 10:00 a.m. on September 20, 2005, and advised her that there were money orders in a closet in the apartment which she could use to pay the back rent which was owed on the apartment.  Observing the money orders themselves, Detective Altland noted that the money orders, on their face, contradicted Rial's account, since they were time-stamped as purchased  at 10:05 a.m., on September 20, 2005, five minutes after Rial claimed that Wright called her to report that the money orders were in the apartment closet.  Defective Altland then questioned Rial regarding this inconsistency and she recanted her initial story, reporting instead that Wright had delivered the money orders to her on the morning of September 20, 2005, shortly after the bank robbery, and had told Rial that he was leaving town for a while because he had done something wrong.  Ms. Rial then agreed to be questioned by local police investigating the Fulton Bank robbery, and later  consented in writing to a search of the apartment she shared with Wright.

Wright was charged with robbery, theft by unlawful taking, and three counts of simple assault relating to the September 20, 2005, bank robbery.  On September

22, 2005, Wright was apprehended in Camden, New Jersey.   On May 10, 2006,

following a jury trial in the York County Court of Common Pleas, Wright was found

guilty of all charges arising from the bank robbery.   Ms. Rial, who was never charged

in connection with this episode, appeared and testified as a Commonwealth witness

at Wright's bank robbery trial.   On June 21, 2006, Wright was sentenced to 5 to 15

years imprisonment and ordered to pay restitution to Fulton Bank in the amount of

$5,171.24.

## II.   **Discussion**

This case comes before us for a determination of whether the Plaintiff, Mr.

Wright, has prevailed on his proof of his claim that his Fourth Amendement rights

were violated because Detective Altland seized money orders from Wright's former

girlfriend, Jora Rial,  without first obtaining her voluntary consent, as required by

law.  With respect to this issue– the sole remaining question in this litigation–the

legal standards which guide of our assessment of this matter are well-established and

can be simply stated.

> The Fourth Amendment to the Constitution provides:  "The right of the
> people to be secure in their persons, houses, papers, and effects, against
> unreasonable searches and seizures, shall not be violated, and no
> Warrants shall issue, but upon probable cause...."  "The touchstone of
> the Fourth Amendment is reasonableness." <u>Florida v. Jimeno</u>, 500 U.S.
> 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Therefore, the

8

Fourth Amendment does not prohibit all searches—only those that are unreasonable. See Illinois v. Rodriguez, 497 U.S. 177, 183, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). The general rule is that the warrantless entry into a person's house is unreasonable *per se*. See Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). This rule, however, is subject to several "jealously and carefully drawn" exceptions. Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). "It is ... well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The Supreme Court has "long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." Jimeno, 500 U.S. at 250–51, 111 S.Ct. 1801. To justify a search based on consent, the Government "has the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). This burden "is not satisfied by showing a mere submission to a claim of lawful authority." Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). There is "no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." Schneckloth, 412 U.S. at 224, 93 S.Ct. 2041. Instead, we determine the voluntariness of a consent by examining the totality of the circumstances. See id. at 227, 93 S.Ct. 2041. Both "the characteristics of the accused and the details of the interrogation" are useful to determine whether, under all the circumstances, a consent to search was voluntary, and no case should "turn[ ] on the presence or absence of a single controlling criterion."[6] Id. at 226, 93 S.Ct. 2041. Factors to consider include: the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment. See id.; see also United States v. Kim, 27 F.3d 947, 955 (3d Cir.1994). We have further identified as relevant "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions." United States v. Givan, 320 F.3d 452, 459 (3d Cir.2003).

9

United States v. Price, 558 F.3d 270, 277-78 (3d Cir. 2009).

Consent to search may be either express or implied. Whether consent is express or implied: " 'In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of ... the possibly vulnerable subjective state of the person who consents.' Schneckloth v. Bustamonte, 412 U.S. 218, 229, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). [A person's] 'personal characteristics are highly relevant to the totality of the circumstances analysis as to whether [her] consent was voluntary.' United States v. Parson, 599 F.Supp.2d 592, 607 (W.D.Pa.2009). Factors to be considered in determining whether the consent was voluntary include characteristics of the person consenting (age, maturity, education, intelligence and experience), and the conditions under which the consent to search were given, including the officer's conduct, the number of officers present, and the duration, location, and time of the encounter. United States v. Hernandez, 76 F.Supp.2d 578, 581 (E.D.Pa.1999) (citing United States v. Lattimore, 87 F.3d 647, 650 (4th Cir.1996))." Salerno v. Galli, 3:CV-07-2100, 2009 WL 3245532 (M.D. Pa. Oct. 7, 2009).

Applying these standards, courts have found implied consent to be voluntary when a person simply relinquishes control of an article to the police at their request.

See, e.g., United States v. Patten, 183 F.3d 1190, 1195 (10th Cir. 1999); United States v. Gordon, 173 F.3d 761, 765-66 (10th Cir. 1999); United States v. Peterson, 100 F.3d 7, 11 (2d Cir. 1996). Similarly, adopting this totality-of-the-circumstances test, courts have found consent to be voluntary when a person surrenders an article to police, and then later signs a written consent to search form. United States v. Bunnell, 280 F.3d 46, 49 (1st Cir. 2002).

In a criminal case the burden of proof rests with the government to prove voluntary consent.  Schneckloth, 412 U.S. at 222.  However, in prisoner civil rights actions, "the majority view is that the defendant has the [initial] burden of producing evidence of consent, while the ' "ultimate risk of nonpersuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials." ' Valance v. Wisel, 110 F.3d 1269, 1278 (7th Cir.1997) (quoting Ruggiero v. Krzeminski, 928 F.2d 558, 563 (2d Cir.1991))." Hogan v. City of Easton, CIV.A.04-759, 2006 WL 2645158 (E.D. Pa. Sept. 12, 2006).  As one appellate court has aptly observed:

> "[E]mploying a criminal burden of proof [in a § 1983 civil action] is contrary to established principles governing civil trials, namely, that the ultimate risk of nonpersuasion must remain squarely on the plaintiff." Bogan, 644 F.3d at 570 (quotations and citations omitted). As the Seventh Circuit explained, "[e]ven if a presumption of unreasonableness arises from the fact of a warrantless search [or entry], that does not serve in a civil case to shift 'the burden of proof in the sense of the risk of

nonpersuasion.' " <u>Valance</u>, 110 F.3d at 1279 (quoting Fed. R. Evid. 301). Instead, such "presumption merely serves to impose on the defendant 'the burden of going forward with evidence to meet or rebut the presumption.' " <u>Id</u>. (quoting Fed.R.Evid. 301). A defendant may satisfy this burden of production by "produc[ing] evidence of consent or of some other recognized exception to the warrant requirement." <u>Id</u>. at 1278. "Yet once the defendant has done so, 'the ultimate risk of nonpersuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials.' " <u>Id</u>. (quoting <u>Ruggiero</u>, 928 F.2d at 563).

<u>Der v. Connolly</u>, 666 F.3d 1120, 1128 (8th Cir. 2012), see also, <u>Bogan v. City of Chicago</u>, 644 F.3d 563, 569-70 (7th Cir. 2011) <u>cert. denied,</u> 132 S. Ct. 1538 (U.S. 2012).

Judged against these legal benchmarks, we find that Mr. Wright's Fourth Amendment claim relating to the seizure of these money orders from his former girlfriend, Jora Rial, fails for several reasons. First, this claim fails as a simple matter of proof and persuasion since Mr. Wright was unable to produce a critical, essential witness to support his assertion that Ms. Rial did not voluntarily consent–Ms. Rial. In this civil setting where typically "the ultimate risk of nonpersuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials", <u>Der v. Connolly</u>, 666 F.3d 1120, 1128 (8th Cir. 2012), Wright's inability or failure to call Ms. Rial is a fatal failure of proof on his claim which is premised upon a showing that Ms. Rial did not voluntarily consent to this search.

In any event, even if we were to apply the criminal burden of proof to this civil matter and hold that the defendants bore the burden of proving consent, <u>Schneckloth</u>, 412 U.S. at 222, we would still find that the evidence sustains a finding that Jora Rial consented to the seizure of these money orders by Detective Altland. In this regard, our finding of consent is based upon our firm conclusion that the evidence, taken as a whole, establishes Rial's implied consent to surrender these money orders, since Defendant Altland readily acknowledges that he did not obtain her express consent before requesting the money orders. Viewing the totality of the circumstances, we find that the evidence clearly demonstrates that Ms. Rial implicitly consented to the seizure of the money orders.

Turning first to "the conditions under which the consent to search were given, including the officer's conduct, the number of officers present, and the duration, location, and time of the encounter, <u>United States v. Hernandez</u>, 76 F.Supp.2d 578, 581 (E.D.Pa.1999) (citing <u>United States v. Lattimore</u>, 87 F.3d 647, 650 (4th Cir.1996))," <u>Salerno v. Galli</u>, 3:CV-07-2100, 2009 WL 3245532 (M.D. Pa. Oct. 7, 2009), we find that Ms. Rial's encounter with Defective Altland took place in daylight hours, in a setting which was familiar and comfortable for Ms. Rial, the common area outside her landlord's office. When Detective Altland met Ms. Rial in this common area, he did not display any overbearing show of force. Rather, the

13

detective was accompanied by a single police office.  Moreover, the uncontradicted evidence of Detective Altland shows that this initial interview with Ms. Rial was conducted in a non-confrontational fashion.  According to Detective Altland, when Rial approached the office he introduced himself to her and asked if she had come to the office to pay back rent.  Detective Altland then recounted that he explained to Rial why he was at the apartment complex and asked if he could see the money orders she had in her possession.  In response to this question, Ms. Rial turned the money orders over to the detective without objection, conduct which many courts have found to be wholly consistent with implied consent.  See, e.g., United States v. Patten, 183 F.3d 1190, 1195 (10th  Cir. 1999); United States v. Gordon, 173 F.3d 761, 76566 (10th Cir. 1999); United States v. Peterson, 100 F.3d 7, 11 (2d Cir. 1996).  Moreover, Rial's surrender of the money orders came at the very outset of her conversation with Detective Altland, and the short duration of this encounter prior to the surrender of the money orders is also strongly suggestive of a voluntary decision to consent. Finally, as the investigation progressed on September 20, 2005, Ms. Rial remained thoroughly cooperative with police, meeting with police officers to be interviewed, and later expressly consenting to a search of the apartment she shared with Wright, factors which also are highly suggestive of voluntary consent in this case.  United States v. Bunnell, 280 F.3d 46, 49 (1st Cir. 2002).   Furthermore, despite his

14

familiarity with Ms. Rial, Mr. Wright has presented no evidence relating to characteristics of Ms. Rial as the person consenting to this search in terms of her age, maturity, education, intelligence and experience, which would suggest that she was particularly susceptible to coercion or intimidation. Thus, nothing about Ms. Rial's background or character would otherwise undermine our conclusion that her consent was wholly voluntary.

Furthermore, we find that, at the time Rial surrendered these money orders to Detective Altland, the detective had probable cause to believe that the money orders were evidence and proceeds of crime. Indeed, by the time the detective encountered Ms. Rial in the common area of her apartment complex on September 20, 2005, he was aware that a man who generally matched the description of her boyfriend and roommate, Mr. Wright, had robbed the Fulton Bank. The detective also knew that the bank robber used a green compact car to escape, a car whose registration was traced to Ms. Rial by police. Furthermore, Detective Altland had learned from the apartment complex manager that Wright and Rial owed substantial back rents, a factor which established a motive for the robbery, and further learned that Ms. Rial had reported a sudden unexpected accumulation of wealth, when she had called the rental office offering to pay this overdue back rent on the very morning of the bank robbery. Evidence of such sudden, unexplained wealth at the time of a crime has long been

recognized as highly probative evidence of guilt.  See, e.g., United States v. Prosper, 375 F. App'x 190 (3d Cir. 2010); United States v. Hall, 44 F. App'x 532 (3d Cir. 2002); United States v. Kenny, 462 F.2d 1205 (3d Cir. 1972).  Thus, the evidence obtained by Detective Altland as he met Ms. Rial on September 20, 2005, fell neatly within this clearly defined, highly relevant and probative category of proof, and fully justified the seizure of these money orders.

Finally, we conclude the Detective Altland is nevertheless entitled to qualified immunity from these claims for damages.  In order to establish a civil rights claim for damages a plaintiff must show the deprivation of a right secured by the United States Constitution or the laws of the United States.  Satisfying these elements alone, however, does not guarantee that the plaintiff is entitled to recover damages from these public officials.  Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known."  Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, —U.S.—, 129 S. Ct. 808, 815 (2009).  This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit."  Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted).  Qualified immunity:

16

balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 129 S. Ct. at 815

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries.  First, the court must evaluate whether the defendant violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 129 S.Ct. 808; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006).  If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor.  Saucier, 533 U.S. at 201.  If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted.  Pearson, 129 S. Ct. at 815-16; Saucier, 533 U.S. at 201-02.  The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances

would understand that his conduct violates that right.  <u>Williams</u>, 455 F.3d at 191 (citing <u>Saucier</u>, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." <u>Wilson</u>, 526 U.S. at 615.  The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (quoting <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)).  In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." <u>Wilson</u>, 455 F.3d at 191 (quoting <u>Hope</u>, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, <u>Pearson</u>, 129 S. Ct. at 820, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. <u>Id.</u>  Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. <u>Gruenke v. Seip</u>,

225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant

v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of

[the] assertion of qualified immunity is a careful examination of the record . . . to

establish . . . a detailed factual description of the actions of each individual defendant

(viewed in a light most favorable to the plaintiff).")

Moreover, in a case such as this, where there are disputed issues of fact, the

Defendant may not invoke qualified immunity as a defense which precludes the

Plaintiffs' claims as a matter of law.  As the United States Court of Appeals for the

Third Circuit has explained:

> Although qualified immunity is a question of law determined by the
> Court, when qualified immunity depends on disputed issues of fact,
> those issues must be determined by the [finder of fact]. See Johnson v.
> Jones, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)
> (qualified immunity may turn on disputed issues of fact); Karnes v.
> Skrutski, 62 F.3d 485, 491 (3d Cir.1995) ("While the qualified immunity
> defense is frequently determined by courts as a matter of law, a [fact-
> finder] should decide disputed factual issues relevant to that
> determination.")

Monteiro v. City of Elizabeth, 436 F.3d 397, 405 (3d Cir. 2006).

Therefore, as the fact-finder in this case, we are obliged to resolve these factual

disputes and then determine whether the Defendants are entitled as a legal matter to

qualified immunity from damages.  In this case, when we resolve these disputed

factual issues, we find that Detective Altland engaged in a brief, non-confrontational encounter with Ms. Rial, during the daylight hours in a familiar setting, a common area in the apartment complex which was her home.  In the course of this encounter Ms. Rial promptly surrendered money orders she had received from Mr. Wright to the police.  Ms. Rial then fully cooperated with police, and signed a consent form authorizing a search of her apartment.  All of these actions were wholly consistent with voluntary consent.  On these facts, given the state of the law in this field, the Defendant simply could not have recognized that his actions would violate "clearly established statutory or constitutional right[] of which a reasonable person would have known."  Wilson v. Layne, 526 U.S. 603, 609 (1999).  Therefore, Detective Altland is entitled to qualified immunity on this claim.[1]

In sum, in this case with respect to the Plaintiff's claim that Detective Altland violated his constitutional rights by seizing money orders from Jora Rial without he voluntary consent:

---

[1]In appropriate cases this Court is entitled to address this qualified immunity defense *sua sponte*, when appropriate. See Doe v. Delie, 257 F.3d 309 (3d Cir. 2001) (affirming *sua sponte* recommendation of qualified immunity by U.S. magistrate judge).

First, we find that the Plaintiff has failed to carry his burden of proof by presenting competent proof from Ms. Rial, or any other witness, that Rial did not voluntarily consent to the surrender of these money orders.

Second, we further find that the Defendants have affirmatively proven, under the totality of the circumstances, that Ms. Rial's consent was voluntary and that there was probable cause to believe that the money orders were fruits and evidence of bank robbery, justifying their seizure and retention as evidence in this case.

Third, we conclude that Detective Altland is entitled to qualified immunity from damages since he could not have recognized that his actions would violate "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999).

### III.   Conclusion

Accordingly, consistent with the findings of fact and conclusions of law set forth in this opinion, IT IS ORDERED that:

1.    We find against the Plaintiff on his remaining Fourth Amendment claim in this action.

2.    We enter judgment in favor of the Defendant on this claim.

3.    The Clerk is directed to close this file.

21

So ordered this 1st day of May 2012.

***S/Martin C. Carlson***
Martin C. Carlson
United States Magistrate Judge